EXHIBIT
1

26CV017784-590

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 26CV_____ |

| | |
|---|---|
| INTELLISITE LLC d/b/a EPIC iO TECHNOLOGIES, | |
| Plaintiff, | COMPLAINT |
| v. | |
| CITY OF EAST POINT, | |
| Defendant. | |

Plaintiff, IntelliSite LLC d/b/a Epic IO Technologies ("EPIC iO"), hereby submits this Complaint against Defendant, City of East Point ("East Point"), and alleges and states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. EPIC iO is a California limited liability company with its principal place of business in Fort Mill, South Carolina.

2. East Point is a municipal corporation located in Fulton County, Georgia.

3. This Court has subject matter jurisdiction over this action pursuant to N.C. Gen. Stat. §§ 7A-240 and 7A-243 because it is a justiciable matter of a civil nature cognizable in the General Court of Justice in which the amount in controversy exceeds $25,000.

4. This Court has personal jurisdiction over the parties pursuant to the parties' contract, in which the parties agreed that "any proceeding to enforce or interpret this Agreement shall be brought before a court of competent jurisdiction in Charlotte, North Carolina."

5. Venue is proper in Mecklenburg County pursuant to North Carolina law, including N.C. Gen. Stat. §§ 1-80, 1-82, as well as the parties' contract.

1

Electronically Filed Date: 3/27/2026 1:54 PM Mecklenburg County Clerk of Superior Court

## FACTS

### The Master Subscription Agreement

6. EPIC iO specializes in advanced Artificial Intelligence (AI) and Internet of Things (IoT) solutions, offering a wide range of products and services designed to provide AI-enabled security and surveillance, enhanced operational efficiency, prioritized wireless broadband connectivity, and streamlined data management across various industries.

7. On or about October 14, 2021, EPIC iO and East Point entered into a Master Subscription Agreement (the "MSA"), pursuant to which EPIC iO would provide a subscription to East Point to access and use certain EPIC iO-owned hardware and software—namely, smart cameras for use throughout the City of East Point. A true and correct copy of the MSA is attached hereto as **Exhibit A** and incorporated herein by reference.

8. Under the terms of the MSA, EPIC iO agreed to provide East Point with access to EPIC iO's smart camera system, which included EPIC iO's hardware and software (the "Products") and certain services to support East Point's use of the Products.

9. The specific Products to be provided to East Point would be identified and described in one or more Statements of Work ("SOW"), which would be governed by the terms of the MSA and executed separately by the parties.

10. In exchange for access to EPIC iO's Products and services, East Point agreed to pay EPIC iO a Subscription Fee, which would be set forth in each SOW.

11. The MSA expressly provided that East Point's subscription was for a five-year term.

12. In other words, EPIC iO agreed to provide, and East Point agreed to pay for, a five-year subscription to EPIC iO's Products and services to be specified in subsequent SOWs.

2

13. East Point's subscription included a limited, non-transferable license to use the Products, which license immediately terminated when the subscription expired.

14. The MSA expressly incorporates by reference the EPIC iO Terms and Conditions and the EPIC iO End User License Agreement ("EULA").

15. The MSA, its schedules and SOWs, together with the Terms and Conditions and EULA (collectively, the "Contract"), contain the entire understanding and agreement between the parties.

<strong>2021: First Statement of Work</strong>

16. The parties executed two SOWs, which are subject to and governed by the terms of the MSA.

17. On October 14, 2021, East Point's then-Mayor, Deana Ingraham, signed the first SOW in which East Point agreed to pay EPIC iO an annual payment of $310,155.20 for five years for a five-year subscription to the Products and services identified in the SOW. A true and correct copy of this SOW is attached to the MSA in **Exhibit A**.

18. The effective date of this SOW was on or about December 1, 2021, and EPIC iO delivered all equipment identified in this SOW to East Point on or about December 6, 2021.

<strong>2022: Second Statement of Work</strong>

19. The parties agreed to a second SOW in which East Point agreed to pay EPIC iO a one-time fee of $46,740 and a recurring monthly payment of $1,700 every month for five years for a five-year subscription to the Products and services identified in Quote #001694, signed by East Point's Shawn A. Dowe on August 17, 2022. A true and correct copy of the 2022 SOW and Quote #001694 is attached hereto as **Exhibit B** and incorporated herein by reference.

3

20. East Point planned to use the Products in the 2022 SOW to monitor East Point's Municipal Building perimeter and interior of the property for site security and compliance.

21. The Municipal Building cameras went online on or about January 31, 2023.

**East Point Had Authority to Enter into the MSA**

22. Before East Point could execute the MSA, East Point had to go through a rigorous approval process that included, at a minimum, the following required steps:

   a. On or about September 20, 2021, the East Point City Council approved the contract;

   b. On or about October 4, 2021, the East Point then-City Attorney, Brad Bowman, reviewed and approved the contract;

   c. Also on or about October 4, 2021, the East Point Director of Procurement, Yolanda Broome, acknowledged that the contract was in compliance with East Point's Municipal Code guidelines;

   d. On or about October 5, 2021, the East Point Budget Manager, Shannon Golden, acknowledged that procurement had been budgeted in that Fiscal Year and funds were available for the contract;

   e. On or about October 10, 2021, the East Point Finance Director, Theresa Thornton, also acknowledged that procurement had been budgeted in that Fiscal Year and funds were available for the contract;

   f. Also on or about October 10, 2021, the East Point City Manager, Frederick Gardiner, approved the contract to move forward, and the contract was received and filed in East Point's Clerk's office.

   g. On October 14, 2021, after East Point completed all of these steps, the then-Mayor of East Point, Deana Holiday Ingraham, signed the MSA and the first SOW on behalf of East Point.

23. Each of the steps in East Point's approval process were tracked on East Point's "Contract Tracking Sheet," a copy of which was provided to Epic IO via email on or about October 15, 2021, and attached to the MSA. (See Exhibit A, page 1.)

24. EPIC iO understood that East Point could not enter into the Contract unless and until East Point had completed each of the steps on the Contract Tracking Sheet.

4

25.     By completing each of the steps on the Contract Tracking Sheet, including the East Point City Council's approval of the contract on September 20, 2021, the East Point City Attorney Brad Bowman's review and approval on October 4, 2021, East Point Director of Procurement Yolanda Broome's acknowledgement that the contract was in compliance with East Point's Municipal Code guidelines on October 4, 2021, and Mayor Ingraham's execution of the contract on October 14, 2021, East Point represented to EPIC iO that East Point had the authority to enter into the Contract and that East Point intended to pay the Subscription Fee for the Products and services identified in the SOWs for a period of five years.

26.     EPIC iO provided Products and services to East Point in reliance on East Point's representations, particularly East Point's willingness and agreement to pay for the Products and services for a five-year subscription term.

**System Outages**

27.     Contrary to EPIC iO's recommendations, and to save money, East Point opted to install EPIC iO's hardware itself, and East Point insisted that it would provide the electrical connections and the power necessary to operate the equipment.

28.     During the course of East Point's subscription, there were some system outages that required the repair or replacement of some of the Products.

29.     Many of these system outages could be traced to external power supply problems (which were East Point's responsibility), not equipment defects.  Indeed, nearly every instance of a camera malfunction was a direct result of East Point's own installation issues or poor or insufficient electrical connections provided by East Point.

30.     Other outages were caused by power issues occurring as a result of a significant storm (i.e., Act of God).

5

31. Rather than use EPIC iO's support services, East Point decided to have its personnel take ownership of replacing failed system components to decrease time to install and to save the city money.

32. Even so, throughout the duration of the Contract, EPIC iO responded promptly to all notifications regarding the status of its equipment and was committed to timely resolving and did timely resolve any issues that arose.

**East Point Stops Paying**

33. East Point often fell behind or was late in meeting its payment obligations.

34. Beginning in June 2024, without any notice to EPIC iO, East Point stopped making its required monthly and annual payments to EPIC iO and began to accrue an outstanding balance.

35. Even though East Point was behind on payments, EPIC iO continued to provide its services under the Contract with East Point and worked with East Point to repair down equipment, including, when necessary, replacing hardware at its own cost.

36. In December 2024, despite having not been paid for approximately six (6) months, EPIC iO initiated meetings with East Point to address issues with cameras that were offline and to develop a remediation plan.

37. EPIC iO proposed two solutions: (1) repair offline sites; or (2) replace some of the hardware with upgraded technology.

38. East Point chose to upgrade the technology, and from January 2025 to April 2025, EPIC iO engaged with East Point personnel and its legal counsel to finalize an addendum to the Contract that clearly set forth the parties' obligations with respect to the upgraded technology.

6

39.     During this time, EPIC iO informed East Point numerous times that it had an outstanding balance and that EPIC iO would not be able to move forward with the addendum and technology upgrade until all outstanding invoices were paid.

**East Point's Unilateral Termination of the Contract**

40.     In August 2025, after accruing an outstanding balance of over $300,000, East Point notified EPIC iO via email that it was "not inclined to move forward with [EPIC iO's] products and service given the malfunction the City has experienced since the service started."

41.     On October 13, 2025, East Point sent a letter to EPIC iO purporting to formally— and unilaterally—terminate the MSA, including the two SOWs that East Point acknowledged were "both executed for five years."

42.     In its letter, East Point wrote that it was terminating the Contract pursuant to Section 7 of the MSA because, *inter alia*, EPIC iO failed to "cure the non-working cameras" after more than thirty days' notice.

43.     Section 7 of the MSA provides that:

> Unless otherwise provided in an SOW, the subscription created by this Agreement shall be non-cancellable and may not be terminated by either party during the Term except in the case of a material breach by the other party, which remains uncured more than 30 days following receipt of written notice from the non-breaching party."

44.     EPIC iO had no obligation to repair or replace failed equipment under the MSA "caused by Customer's installation, mishandling, misuse or damage to the Products."

45.     As set forth above, East Point's alleged issues with the operability of EPIC iO's Products were as a direct result of East Point's own actions and/or inactions, including East Point's decision to run its own electricity to the project and its defective installations, chronic maintenance failures, and delays in fixing known outages.

7

46. To the extent EPIC iO had an obligation to repair or replace "non-working cameras," it did so in a timely manner as required by the MSA.

47. Because EPIC iO did not materially breach any provision of the MSA or SOWs, East Point did not have the right to unilaterally terminate the MSA pursuant to Section 7.

**East Point's Execution of a New 5-Year Contract with a Competing Vendor**

48. Before unlawfully terminating the Contract with Epic IO, East Point executed a five-year contract with Verkada, Inc., for the procurement and licensing of security camera systems.

49. East Point's official Proposed Budget Book for Fiscal Year 2026 (July 2025-June 2026), published on East Point's website, expressly allocates $10,125 for a "Verkada 5-Year Camera License" covering fifteen (15) cameras at $675 per camera, for a total budget request of $364,925.

50. East Point entered into this long-term commitment with a competing vendor while the Contract remained in effect and EPIC iO was continuing to perform in good faith for East Point's benefit, despite East Point's failure to timely pay while East Point simultaneously disputed and refused to pay its outstanding invoices.

**COUNT I: BREACH OF CONTRACT – PAYMENT OBLIGATIONS**

51. EPIC iO incorporates and re-alleges the allegations in the preceding paragraphs.

52. EPIC iO and East Point entered into a valid and enforceable contract pursuant to which EPIC iO agreed to provide a subscription to East Point to access and use certain EPIC iO-owned Products for a period of five years.

53. EPIC iO fully performed all of its obligations under the contract.

8

54. All prerequisites and conditions precedent to EPIC iO's full and complete performance were satisfied.

55. Pursuant to the Contract, East Point promised to pay EPIC iO monthly and annual subscription fees, as described more fully above, for a five-year subscription of EPIC iO's Products and services.

56. East Point stopped paying its Subscription Fees prior to the end of the five-year subscription and notified EPIC iO that it does not intend to pay for the Products and services, as promised.

57. East Point's refusal to pay as promised and as required under the Contract constitutes a material breach and repudiation of its obligations under the Contract.

58. When East Point unilaterally and unjustifiably terminated the Contract, EPIC iO was ready, willing, and able to continue to perform.

59. EPIC iO has not waived or relieved East Point of the obligations and duties that East Point breached.

60. As a direct and proximate result of East Point's breach of the Contract, EPIC iO incurred damages in excess of $900,000 in an amount to be proven at trial.

**COUNT II: BREACH OF CONTRACT – FAILURE TO RETURN PRODUCTS**

61. EPIC iO incorporates and re-alleges the allegations in the preceding paragraphs.

62. EPIC iO and East Point entered into a valid and enforceable contract pursuant to which EPIC iO agreed to provide a subscription to East Point to access and use certain EPIC iO-owned Products for a period of five years.

63. EPIC iO fully performed all of its obligations under the contract.

9

64. All prerequisites and conditions precedent to EPIC iO's full and complete performance were satisfied.

65. Section 6 of the MSA, titled "**Title to Products; Return; Damage**," provides that:

> At all times during and after the Term, the Products shall remain the sole and exclusive property of [EPIC iO], and Customer's right to possess and operate the Products shall be limited as set forth herein. . . . Upon the expiration or any termination of this Agreement, Customer agrees to promptly return the Products to [EPIC iO's] address set forth above. In the event the Products are not returned within 15 days following the end of the Term, or are damaged or destroyed while in Customer's possession, Customer shall pay the Replacement Cost set forth on the applicable SOW for each such Product.

66. East Point notified EPIC iO that it was unilaterally terminating the Contract on October 13, 2025.

67. More than fifteen (15) days have passed since East Point terminated the Contract, yet East Point has not returned EPIC iO's Products or paid the Replacement Cost of the Products, which totals more than $200,000 (*see* **Exhibit C**).

68. East Point's refusal to return the Products or pay the Replacement Cost of the Products constitutes a material breach of its obligations under the MSA.

69. EPIC iO has not waived or relieved East Point of the obligations and duties that East Point breached.

70. As a direct and proximate result of East Point's breach of the contract, EPIC iO incurred damages in excess of $900,000 in an amount to be proven at trial.

### ALTERNATIVE COUNT III: UNJUST ENRICHMENT

71. EPIC iO incorporates and re-alleges the allegations in the preceding paragraphs.

72. East Point received a benefit from EPIC iO for the Products and services provided to East Point, as set forth above.

73. East Point knew and consciously accepted the benefit conferred by using EPIC iO's Products services.

74. EPIC iO did not provide Products or perform services officiously or gratuitously, and it expected to be paid for those Products and services.

75. East Point paid for the Products and services until approximately June 2025, when it stopped paying EPIC iO without notice or justification.

76. East Point has failed and refused to pay for the Products and services provided by EPIC iO since approximately June 2025 and now owes more than $700,000 to EPIC iO.

77. In addition to failing to pay its outstanding balance for the Products and services provided by EPIC iO, East Point has also retained possession of the Products for which it has not paid, the cost of which totals more than $200,000 (*see* **Exhibit C**).

78. For East Point to retain the benefit of EPIC iO's Products and services and to retain possession of the Products without paying for them would be inequitable.

79. East Point has been unjustly enriched at EPIC iO's expense and is thus required to make restitution to EPIC iO in an amount in excess of $900,000 to be proven at trial, together with interest, costs, and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, EPIC iO respectfully prays the Court for the following relief:

1. That EPIC iO be awarded damages in an amount to be determined at trial;

2. That the Court tax the costs of this action against East Point; and

11

3. That attorney's fees, interest, and costs be awarded in favor of EPIC iO as permitted by applicable law.

This the 27th day of March, 2026.

/s/ Alexandra J. Hirsch
Alexandra J. Hirsch
North Carolina State Bar No. 47808
FOX ROTHSCHILD LLP
101 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28246
Phone: (704) 384-2600
Fax: (704) 384-2800
Email: ahirsch@foxrothschild.com
*Counsel for Plaintiff*

12

# STATE OF NORTH CAROLINA

File No.
26CV017784-590

_____MECKLENBURG_____ County

In The General Court Of Justice
☐ District  ☒ Superior Court Division

*Name Of Plaintiff*
INTELLISITE LLC d/b/a EPIC iO TECHNOLOGIES

*Address*

*City, State, Zip*

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

### VERSUS

*Name Of Defendant(s)*
CITY OF EAST POINT

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| City of East Point<br>East Point City Hall<br>2757 E Point Street<br>East Point                    GA        30344 | |

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* 3/27/2026 | *Time* 1:59:44 pm ☐ AM ☐ PM |
|---|---|---|
| Alexandra J. Hirsch<br>Fox Rothschild LLP<br>101 S. Tryon Street, Suite 1700<br>Charlotte                    NC        28246 | *Signature* /s/ Kayla Moore | |
| | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have* **MANDATORY ARBITRATION** *programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

Case 3:26-cv-00343    Document 1-1    Filed 04/30/26    Page 13 of 14

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
|  |  |  |  |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
|  |  |  |  |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff *(type or print)* |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts